Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 4, 2002        Decided June 20, 2003

No. 01-5294

PUBLIC CITIZEN, INC.,
APPELLEE

v.

U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES AND CENTERS FOR MEDICARE AND MEDICAID SERVICES, *F/K/A* HEALTH CARE FINANCING ADMINISTRATION,
APPELLANTS

————

Consolidated with
01–5298

————

Appeals from the United States District Court
for the District of Columbia
(No. 00cv00731)

————

*G. Michael Harvey*, Assistant U.S. Attorney, argued the cause for appellants. With him on the briefs were *Roscoe C.*

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Howard, Jr.*, U.S. Attorney, *R. Craig Lawrence*, Assistant U.S. Attorney, *Alex M. Azar II*, General Counsel, U.S. Department of Health & Human Services, and *Henry R. Goldberg*, Deputy Associate General Counsel.

*Darrel J. Grinstead* and *Jeffrey D. Pariser* were on the brief for *amici curiae* The American Hospital Association, et al., in support of appellants and reversal.

*Amanda Frost* argued the cause for appellee. With her on the brief was *Allison Zieve. Brian Wolfman* entered an appearance.

*Sarah Lenz Lock, Dorothy Siemon, Michael Schuster, Vicki Gottlich*, and *Gill Deford* were on the brief for *amici curiae* The Center for Medicare Advocacy, Inc., and AARP in support of appellee urging affirmance.

Before: EDWARDS, ROGERS, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by GARLAND, *Circuit Judge*.

GARLAND, *Circuit Judge*: When a Medicare beneficiary files a complaint with a Peer Review Organization (PRO) about the quality of medical services that he or she has received, the Peer Review Improvement Act requires the PRO to "inform the individual . . . of the organization's final disposition of the complaint." 42 U.S.C. § 1320c–3(a)(14). According to the Health Care Financing Administration (HCFA) of the Department of Health and Human Services (HHS), a PRO can comply with this requirement by sending the complainant a form letter that merely states that the PRO has examined the complainant's concerns and that it will take appropriate action if warranted.[1] Indeed, if the complainant's health care practitioner objects to the PRO providing infor-

---

[1] HHS has recently renamed PROs as Quality Improvement Organizations, and has changed the name of HCFA to the Centers for Medicare & Medicaid Services. *See* 67 Fed. Reg. 36,539 (May 24, 2002); 66 Fed. Reg. 35,437 (July 5, 2001). For convenience, this opinion will continue to use the PRO/HCFA terminology, following the practice of the parties and of the district court.

mation that explicitly or implicitly identifies the practitioner, HCFA bars the PRO from saying anything more.

We conclude that the statutory command to inform a complainant of the "final disposition" of the complaint requires more than what HCFA currently permits. At a minimum, it requires the organization to notify the complainant of the results of its review. We therefore affirm the district court's order invalidating those provisions of the Department's Peer Review Organization Manual that bar PROs from providing such information to complaining beneficiaries.

I

A

In 1982, Congress amended the Social Security Act by enacting the Peer Review Improvement Act of 1982, Pub. L. No. 97–248 §§ 141–150, 96 Stat. 324 (1982) (codified as amended at 42 U.S.C. § 1320c *et seq.*). The 1982 Act called for HHS to contract with PROs to perform a range of quality improvement and professional review activities. PROs are private, geographically based organizations composed of licensed doctors "engaged in the practice of medicine or surgery in the area." 42 U.S.C. § 1320c–1. HCFA contracts with PROs to review the quality, reasonableness, and efficiency of medical services provided under Medicare, as well as to determine whether the services provided are within Medicare's statutory coverage. *Id.* § 1320c–3(a)(1); *see also id.* § 1395y(g).

Section 1320c–3(a)(1) of the statute requires each PRO to "review some or all of the professional activities" of physicians and other providers of services for which payment may be made under Medicare. *Id*. § 1320c–3(a)(1). The statute also contains a number of confidentiality provisions, including § 1320c–9(a), which states:

> Any data or information acquired by any such organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to any

person except—(1) to the extent . . . necessary to carry out the purposes of this part, (2) in such cases and under such circumstances as the Secretary shall by regulations provide to assure adequate protection of the rights and interests of patients, health care practitioners, or providers of health care, or (3) in accordance with [provisions permitting specified disclosures to federal and state agencies].

42 U.S.C. § 1320c–9(a).

On April 17, 1985, pursuant to the delegation of authority contained in § 1320c-(9)(a)(2), HCFA issued regulations defining "confidential information" to include: "(1) Information that explicitly or implicitly identifies an individual patient, practitioner or reviewer[;] (2) Sanction reports and recommendations[;] (3) Quality review studies which identify patients, practitioners or institutions[; and] (4) PRO deliberations." 42 C.F.R. § 480.101(b). The regulations, however, also incorporate the statutory exceptions for disclosure of confidential information enumerated in § 1320c–9(a)(1) & (3) and set out above. 42 C.F.R. § 480.103. They further provide that a PRO "may disclose to any person, agency or organization, information on a particular practitioner or reviewer with the consent of that practitioner or reviewer provided that the information does not identify other individuals." *Id.* § 480.133(a)(2)(iii). The regulations became effective on May 17, 1985, and have not changed in relevant part since that time. *Compare* 42 C.F.R. §§ 476.101(b), 476.103, 476.133 (1985), *with* 42 C.F.R. §§ 480.101(b), 480.103, 480.133 (2002).

In October 1986, approximately a year and a half after HCFA promulgated its confidentiality regulations, Congress amended § 1320c–3 to impose upon PROs the further duty that is specifically at issue in this case. The new section, § 1320c–3(a)(14), provides as follows:

The organization shall conduct an appropriate review of all written complaints about the quality of services . . . not meeting professionally recognized standards of health care, if the complaint is filed with the organization by an individual entitled to benefits for such services . . . (or a person acting on the individual's behalf). *The*

*organization shall inform the individual (or representative) of the organization's final disposition of the complaint.* Before the organization concludes that the quality of services does not meet professionally recognized standards of health care, the organization must provide the practitioner or person concerned with reasonable notice and opportunity for discussion.

42 U.S.C. § 1320c–3(a)(14) (emphasis added). HHS has not promulgated any regulation that implements or addresses § 1320c–3(a)(14).

B

On December 15, 1998, Doris Shipp went to Baptist East Hospital in Louisville, Kentucky, complaining of abdominal pain. Over the next few months, Mrs. Shipp was seen by Drs. Peter Thurman, Thomas C. Dedman, and David Jolgren. Mrs. Shipp died of cancer in June 1999. On December 6, 1999, her husband, David Shipp, wrote to Health Care Excel (Excel), the PRO responsible for monitoring the delivery of Medicare services in Kentucky, and asked Excel to investigate and respond to his concerns about the quality of care that his wife had received.

In response, Excel sent Mr. Shipp three letters—one for each of the three physicians—entitled "Notice: Quality of Care Determination." The first letter, concerning Dr. Thurman, informed Shipp that "[n]o quality of care concerns were identified with the services provided by Dr. Thurman," and that "[i]t has been determined that the examination your wife received on March 24, 1999, was appropriate and not expected to reveal the cecal cancer diagnosis that was discovered later." J.A. 58. This language approximates the model response provided in HCFA's Medicare Peer Review Organization Manual for use in situations "[w]hen the involved practitioner consents to disclosure of information that identifies him/her." HCFA, Medicare Peer Review Organization Manual Transmittal 84, Ex. 5–17 (Dec. 21, 2000) [hereinafter PRO Manual].

The letters concerning Drs. Dedman and Jolgren, by contrast, advised Mr. Shipp that, because those doctors did not

consent to the release of information about the care they provided, Excel could not provide specific information about the results of its review. Each letter contained the following paragraph:

> *We have carefully examined all the issues raised in your correspondence and conducted a thorough review of the care your wife received.* Federal laws and regulations prohibit us from releasing information about your care without the consent of your physician. Your wife's physician did not give consent; therefore, we are unable to provide any specific information about the results of our review. Our inability to provide this information does not mean that we found any problem with the care she received. However, *please be assured that if we did find a problem, we will take all necessary action when our review findings warrant it.*

J.A. 54, 56 (emphasis added). This response approximates the model provided in the PRO Manual for use "[w]hen the involved practitioner does not consent to disclosure of information that explicitly or implicitly identifies him/her," PRO Manual, Ex. 5–17,[2] and follows the instructions contained in the manual's narrative sections.[3] PRO manuals since 1990

---

[2] HCFA's model letter states:

> *We have carefully examined your concern(s) and conducted a thorough review of the medical records pertaining to the services that (you or name of beneficiary) received.* Federal regulations prohibit us from releasing information that identifies the involved practitioner without his or her consent. Because the involved practitioner did not give (his or her) consent, we are unable to release information that would explicitly or implicitly identify him/her. This does not necessarily mean that we found a problem with the services (you or name of beneficiary) received. However, *we will take appropriate action if warranted by our review findings.*

PRO Manual, Ex. 5–17 (italics added; underlining in original).

[3] The manual instructs the PRO to write the complainant and: (i) "Assure that you conducted a complete review of the medical

have expressed a similar nondisclosure policy.[4]

C

Mr. Shipp is a member of Public Citizen, Inc., a nonprofit consumer advocacy organization. On behalf of Mr. Shipp and other similarly situated members, Public Citizen sued HHS and HCFA under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), contending, inter alia, that the PRO Manual's instructions violate § 1320c–3(a)(14)'s requirement that PROs inform complainants of the "final disposition" of the complaint. Public Citizen asked the district court: (i) to declare invalid the regulations and policies that prohibit PROs from disclosing the results of PRO investigations when to do so would identify a nonconsenting practitioner; and (ii) to direct the defendants to retract those manual provisions and inform PROs that they must disclose the results of their investigations. First Am. Compl. at 4–5 (J.A. 35–36).

On cross-motions for summary judgment, the district court found it clear from " 'the history, structure, and underlying policy purpose of the statute' . . . that § 1320c–3(a)(14) requires a PRO to inform beneficiary complainants of the substantive disposition of the complaint." *Public Citizen, Inc. v. Department of Health & Human Servs.*, 151 F. Supp.

records and thoroughly examined all issues raised by the complainant"; (ii) "Explain that you are unable to provide any information that explicitly or implicitly identifies the involved practitioner because applicable regulations prohibit the release of such information without the practitioner's consent"; (iii) "Explain that your inability to disclose information that explicitly or implicitly identifies the involved practitioner does not mean that you found any problem with the care furnished"; and (iv) "Assure that even though you are unable to disclose information that . . . identifies the involved practitioner, you are taking necessary action if your review warrants it." PRO Manual § 5030(C).

[4] *See* HCFA, Medicare Peer Review Organization Manual Transmittal 76 § 5030(C) (Sept. 1999) (J.A. 99–100); HCFA, Medicare Peer Review Organization Manual Transmittal 41 § 5250(B) (Oct. 1994) (J.A. 116); HCFA, Medicare Peer Review Organization Manual Transmittal 27 § 5045(B) (1990) (J.A. 127).

2d 64, 71 (D.D.C. 2001) (quoting *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1048 (D.C. Cir. 1997)). The court granted Public Citizen's motion for summary judgment and, inter alia, held that "the provisions in HCFA's PRO Manual prohibiting disclosure of the results of § 1320c–3(a)(14) investigations are contrary to law." *Id.* at 77.

## II

We review the district court's grant of summary judgment de novo. *Arizona v. Thompson*, 281 F.3d 248, 253 (D.C. Cir. 2002). The government contends that our analysis is governed by the standard of review articulated by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under that decision, when reviewing an agency's construction of a statute that it administers, we first ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, "that is the end of the matter" and we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue," we move to the second step and must defer to the agency's interpretation as long as it is "based on a permissible construction of the statute." *Id.* at 843.

The one thing that is indisputably clear about the statute at issue here is that it does not unambiguously mandate the *government*'s interpretation, and the government does not contend otherwise. *See* Appellants' Br. at 14, 40–41. The district court concluded that § 1320c–3(a)(14) unambiguously supports the *plaintiff*'s interpretation and requires PROs to advise complainants of the results of the peer review investigation. It therefore held, under step one of *Chevron*, that the government's interpretation—which construes the section as requiring PROs to do nothing more than inform beneficiaries that their complaint has been disposed of, without describing the content of that disposition—cannot stand. We find considerable merit in the district court's view of congressional

intent. For the reasons discussed below, however, we need not (and therefore do not) rest our decision on *Chevron*'s first step.

Nor do we rely on the second step of *Chevron*. As the Supreme Court has recently held, not all statutory interpretations by agencies qualify for the level of deference afforded by that step. *See United States v. Mead Corp.*, 533 U.S. 218, 227–31 (2001); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). In *Mead*, the Court declared *Chevron* deference appropriate only where Congress has "delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226–27.

There is no dispute that the first part of this requirement is met by Congress' delegation to the Secretary of the authority to promulgate "regulations" governing PROs in general, 42 U.S.C. § 1320c–3(a)(8), and the disclosure of PRO information in particular, *id.* § 1320c–9(a) (forbidding disclosure of PRO data except in accordance with the statute, or "in such cases and under such circumstances as the Secretary shall by *regulations* provide to assure adequate protection of the rights and interests of patients, health care practitioners, or providers of health care" (emphasis added)). But the Secretary has not promulgated any regulation that interprets or even mentions § 1320c–3(a)(14). The only potentially relevant regulations, the confidentiality regulations of 42 C.F.R. pt. 480 described above, were promulgated before § 1320c–3(a)(14) was enacted in 1986. *See* Medicare Program; Acquisition, Protection, and Disclosure of Utilization and Quality Control Peer Review Organization (PRO) Information, 50 Fed. Reg. 15,347 (Apr. 17, 1985). Accordingly, as counsel for the government conceded at oral argument, those regulations cannot provide a basis for deferring to the defendants' interpretation of the meaning of the subsequently enacted phrase, "final disposition of the complaint." *See Christensen*, 529 U.S. at 587 (declining to apply *Chevron* deference to regulation that did not address statutory issue).

The only agency pronouncement upon which the defendants' claim for deference relies is HCFA's PRO Manual. It is true, as defendants note, that *Chevron* deference is not necessarily limited to regulations that are the product of notice-and-comment rulemaking. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002); *Mead*, 533 U.S. at 231. But the Supreme Court has twice cited "agency manuals" as an archetype of the kind of document that is not entitled to such deference. *Mead*, 533 U.S. at 234 (declaring that interpretations such as those "in policy statements, agency manuals, and enforcement guidelines" are "beyond the *Chevron* pale" (internal quotation marks omitted)); *Christensen*, 529 U.S. at 587 ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *see also Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 123 S.Ct. 1017, 1026 (2003) (applying *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), rather than *Chevron*, to statutory interpretations contained in the Social Security Administration's Program Operations Manual System).[5]

Whether or not some agency manuals might still be worthy of *Chevron* deference, there is nothing to distinguish the one at issue here from those disfavored by the Supreme Court. Indeed, this court has previously held that similar sections of HCFA's PRO Manual do not involve "substantive rights." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045, 1049–51 (D.C. Cir. 1987). To the contrary, we said that "[a] peer review organization is essentially an enforcement agent of the federal government," *id.* at 1048, and that the manual merely

---

[5] *See also Power v. Barnhart*, 292 F.3d 781, 785–86 (D.C. Cir. 2002) (noting the government's concession that *Chevron* did not apply to the Social Security Administration's Hearings, Appeals and Litigation Law Manual); *American Fed'n of Gov't Employees v. Veneman*, 284 F.3d 125, 129 (D.C. Cir. 2002) (holding that the model meat inspection program at issue there had "no more status than opinion letters, policy statements, agency manuals, and enforcement guidelines, all of which are undeserving of *Chevron* deference").

"maps out an enforcement strategy for the PROs with whom HHS contracts," *id.* at 1049; *see id.* at 1050–51 (holding that the manual's commands are neither legislative nor interpretive rules); *see also Mead*, 533 U.S. at 234 (declaring that interpretations contained in agency "enforcement guidelines" fail to qualify for *Chevron* deference). And while the PRO statute expressly authorizes the Secretary to promulgate "regulations" to carry out its provisions, 42 U.S.C. § 1320c–3(a)(8), it contains no mention of agency manuals.

In a short passage in its opening brief, the government argues that the manual has the force of law because the contracts between HCFA and the PROs require PROs to adhere to the confidentiality provisions of the manual. Appellants' Br. at 43 (referring to sample contract, at J.A. 131). But the contracts with the PROs are not materially different from a myriad of contracts entered into by a myriad of agencies. *See Bowen*, 834 F.2d at 1048 ("Like an independent contractor hired to construct a government building, the PRO carries out a task for pay at the behest of the government.").[6] No court has read *Mead* as extending *Chevron* deference to a contract entered into between an agency and a private party, and we are loathe to permit agencies to bootstrap documents that otherwise would not warrant *Chevron* deference into a more exalted status merely by mentioning them in such a contract. *Cf.* J.A. 131 (sample PRO contract, requiring PRO to adhere to "the Code of Federal Regulations, . . . the PRO Manual, *and other administrative directives*" (emphasis added)). Indeed, according *Chevron* deference would be particularly inappropriate in this case because the complaining Medicare recipient—for whose benefit § 1320c–3(a)(14) was enacted—is a stranger to the contract upon which the government seeks to rely.

Finally, even if we were prepared to accord *Chevron* deference to the PRO Manual, that document contains no interpre-

---

[6] We further held in *Bowen* that "any contract provisions that are legislative are subject to [5 U.S.C.] § 553's notice and comment requirements." *Id.* at 1054. To our knowledge, none of the manual provisions at issue here has been subjected to notice and comment.

tation of § 1320c–3(a)(14) to which we might defer. In an introductory paragraph, the manual does contain a reference to § 1320c–3(a)(14)'s requirement that the PRO "inform beneficiaries or their designated representatives of the final disposition of the complaint," PRO Manual § 5000, but this does little more than repeat the statutory language. As authority for its nondisclosure policy, the manual cites only the confidentiality regulations promulgated before § 1320c–3(a)(14) appeared on the scene.[7] And the part of the manual that contains the model response letters and instructions does not reference § 1320c–3(a)(14) at all, relying instead on those preexisting confidentiality regulations.[8] Most important, there is no place in the manual where the agency explains *why* it believes that a PRO satisfies the statutory injunction to inform a complainant of the "final disposition" of the complaint simply by telling him that it has investigated the matter and will take action if appropriate. Because the manual thus contains no reasoning that we can evaluate for its reasonableness, the high level of deference contemplated in *Chevron*'s second step is simply inapplicable.[9]

---

[7] *See* PRO Manual § 5000 (stating that "42 CFR 480.32 addresses disclosure of information about practitioners, reviewers, and institutions," and that "[t]he regulations also limit your ability to give specifying details about a complaint review"); *id.* § 5035 ("[D]isclosure of PRO quality review information is governed by federal confidentiality regulations at 42 CFR Part 480.").

[8] *See* PRO Manual § 5030(C) ("Explain that you are unable to provide any information that explicitly or implicitly identifies the involved practitioner because *applicable regulations* prohibit the release of such information without the involved practitioner's consent." (emphasis added)); *id.* Ex. 5–17 (model letter, noting that "[f]ederal regulations" bar release of the information).

[9] *Cf. Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5 (1978) (stating that "the mere promulgation of a regulation, without a concomitant exegesis of the statutory authority for doing so, obviously lacks 'power to persuade' as to the existence of such authority"); *SEC v. Sloan*, 436 U.S. 103, 118 (1978) (reaching the same conclusion "where this Court can only speculate as to the Commission's reasons for reaching the conclusion that it did"

Although *Chevron* deference is unwarranted, HCFA's interpretation of § 1320c–3(a)(14) is nevertheless due a degree of deference under the rule of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). As *Mead* explained, under *Skidmore* an agency's statutory interpretation remains "eligible to claim respect according to its persuasiveness." *Mead*, 533 U.S. at 221; *see Christensen*, 529 U.S. at 587 (holding that where "*Chevron*-style deference" is unwarranted, agency interpretations are " 'entitled to respect' . . . , but only to the extent that those interpretations have the 'power to persuade' " (quoting *Skidmore*, 323 U.S. at 140)).

### III

In determining the proper construction of § 1320c–3(a)(14), both parties urge us to examine the statute's text, structure, legislative history, and purpose. *See Bell Atl. Tel. Cos.*, 131 F.3d at 1047. We proceed to that task in the following sections.

### A

"We turn first, as we must, to the language of the statute, 'the most important manifestation of Congressional intent.' " *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1304 (D.C. Cir. 1981). Section 1320c–3(a)(14) states that the PRO "shall inform the individual (or representative) of the organization's final disposition of the complaint." HCFA contends that the term "final disposition" has merely a procedural meaning— that the PRO must inform the complainant that the matter has been finally disposed of, but that it need include nothing about the substance of that disposition. As the agency points out, there are dictionary definitions that are somewhat supportive of that view, although even these are ambiguous. *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 335 (10th ed. 1996) (defining "disposition" as "the act or the power of disposing");

———

because the agency's orders did not "address[ ] in any detail the statutory authorization under which it took [the] action").

BLACK'S LAW DICTIONARY 423 (5th ed. 1979) (defining "disposition" as the "[a]ct of disposing").

We note at the outset that even if this were the appropriate definition of "final disposition," the PRO Manual's instructions and model letter would still be invalid. The manual's provisions do not require the PRO to advise the complainant that the matter *has been* disposed of, but only that the PRO has reviewed the matter and "*will* take appropriate action *if* warranted by our review findings." PRO Manual, Ex. 5–17 (emphasis added); *see also* Letter from Excel to David Shipp (Aug. 7, 2000) (J.A. 56) (advising that "*if* we did find a problem, we *will* take all necessary action *when* our review findings warrant it" (emphasis added)). In short, because they speak of the possibility of future action and not of a final disposition that has already occurred, the manual's provisions do not even comply with the defendants' own construction of § 1320c–3(a)(14).[10]

But we are not, in any event, persuaded by HCFA's construction. To the contrary, the far more persuasive reading is that to inform someone of the "final disposition" of a matter means to inform him of its substantive result or conclusion. *See, e.g.*, DANIEL J. ORAN, ORAN'S DICTIONARY OF THE LAW 134 (1983) (defining "disposition" as final "settlement or result"); WILLIAM C. BURTON, BURTON'S LEGAL THESAURUS 187 (3d ed. 1998) (including as synonyms "conclusion, decision, . . . final settlement of a matter, finding, order, pronouncement, . . . resolution, settlement, [and] solution"); BLACK'S LAW DICTIONARY 484 (7th ed. 1999) ("[a] final settlement or determination").[11] The context that comes quickest

---

[10] *Compare* Appellants' Br. at 16 (arguing that the statute should be "read as permitting a PRO . . . to inform the complainant . . . that the complaint was received, that it was investigated, and that corrective action *was* taken if appropriate" (emphasis added)).

[11] *See also* Administrative Procedure Act § 1(6), 5 U.S.C. § 551(6) (defining "order" as "the whole or a part of a final disposition"); 42 U.S.C. § 405(j)(6) (requiring the Social Security Commissioner to report to Congress on the "final disposition," "including any criminal penalties imposed," of certain restitution cases); 42 U.S.C.

to the judicial mind, of course, is the disposition of a case. *See, e.g.*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, at 335 (defining "disposition" as the "final arrangement" of a case); WILLIAM STATSKY, WEST'S LEGAL THESAURUS/DICTIONARY 247 (1985) (defining "disposition" as "[t]he final arrangement or decision (we awaited the court's disposition)"); ORAN'S DICTIONARY OF THE LAW, at 134 ("A court's disposition of a case may be to give a judgment, dismiss the case, pass sentence on a criminal, etc." (emphasis omitted)). After hearing argument, judges frequently tell the parties that they will advise them of the disposition of the matter.[12] We expect that litigants, including the parties to this appeal, would be both surprised and puzzled if all we told them at the end of the day was that "the case has been decided"—without telling them what that decision was. This view is, if anything, reinforced by the fact that the statute commands the PRO to inform the complainant "of" the final disposition, not simply "when" that disposition has taken place.

This view is further reinforced by considering the context in which the information command that is contained in § 1320c–3(a)(14)'s second sentence appears. The preceding sentence defines the types of complaints that PROs must investigate: "*complaints about the quality of services . . . not meeting professionally recognized standards of health care.*" 42 U.S.C. § 1320c–3(a)(14) (emphasis added). The following sentence (the section's third) imposes an administrative due process requirement before the PRO may make a certain

---

§ 3759(b)(1) (requiring the improvement of criminal justice records by "complet[ing] . . . criminal histories to include the final dispositions of all arrests for felony offenses"); 29 U.S.C. § 794a (describing remedies for an employee "aggrieved by the final disposition of [a Rehabilitation Act] complaint"); 42 U.S.C. § 2000e–16(c) (same for federal employee "aggrieved by the final disposition of his [EEOC] complaint").

[12] *Cf.* FED. R. APP. P. 21(b)(7) (directing the appeals court's clerk to "send a copy of the final disposition" to the trial court judge when the appellate court decides a petition for mandamus); FED. R. APP. P. 28 (requiring that appellant's brief contain "a statement of the case briefly indicating . . . the disposition below").

kind of finding: "Before the organization *concludes that the quality of services does not meet professionally recognized standards of health care*, the organization must provide the practitioner . . . with reasonable notice and opportunity for discussion." *Id.* (emphasis added). This context confirms that the information that is to be imparted to the Medicare beneficiary—after the PRO investigates the complaint and affords the practitioner due process—should contain the PRO's determination as to whether the quality of services received met "professionally recognized standards of health care."

At oral argument, the government contended that the procedural protections of the third sentence of § 1320c–3(a)(14) were designed not to afford practitioners due process before sharing adverse findings with complainants, as one would conclude from the two preceding sentences, but rather to protect practitioners from unwarranted notification to state licensing boards. It is true that another section, § 1320c–3(a)(9)(B), requires a PRO to notify a state licensing board if it finds that a physician has furnished services not meeting professionally recognized standards of health care. 42 U.S.C. § 1320c–3(a)(9)(B). Section 1320c–3(a)(9)(B), however, contains its own due process provision, permitting such notification only "after notice and hearing." *Id.* It would be illogical to conclude that the procedural protections of § 1320c–3(a)(14) were intended not to precede the beneficiary notification required by that section, but merely to duplicate protections that § 1320c–3(a)(9)(B) already provides as prerequisites to its state board notification requirement. Moreover, there is an even more fundamental flaw in the government's argument: because § 1320c–3(a)(9)(B) was not enacted until 1990, four years after § 1320c–3(a)(14) became law,[13] it simply is not possible that the third sentence of § 1320c–3(a)(14) was intended to provide due process protections for the not-yet-enacted notification requirement of § 1320c–3(a)(9)(B).

---

[13] *See* Pub. L. No. 101–508 § 4205(d)(1)(A), 104 Stat. 1388 (1990). No similar provision existed in 1986, when § 1320c–3(a)(14) was enacted. *See* 42 U.S.C. § 1320c–3 *et. seq.* (1982 & Supp. IV 1986).

In sum, both the text and the context of the second sentence of § 1320c–3(a)(14) persuade us that it was intended to require a PRO to inform a complainant of the results of its review of his complaint, and specifically of whether the "quality of the services" that the recipient received met "professionally recognized standards of health care." 42 U.S.C. § 1320c–3(a)(14).

## B

HCFA next urges us to look beyond the words of § 1320c–3(a)(14), both to other provisions of the PRO statute and to its overall structure, arguing that the district court's interpretation of the section is inconsistent with the statutory scheme. We find no such inconsistency.

The government's first contention is that requiring PROs to notify beneficiary complainants of the results of their reviews would abrogate the confidentiality provisions of the PRO statute. The principal confidentiality provision is § 1320c–9(a), which, as noted above, states:

> Any data or information acquired by any such organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to any person *except*—(1) to the extent . . . necessary to carry out the purposes of this part, (2) in such cases and under such circumstances as the Secretary shall by regulations provide to assure adequate protection of the rights and interests of patients, health care practitioners, or providers of health care, *or* (3) in accordance with [provisions permitting specified disclosures to federal and state agencies].

42 U.S.C. § 1320c–9(a) (emphasis added).

HCFA contends that requiring disclosure of the results of the PRO review is contrary to § 1320c–9(a)(2) because such disclosure is not affirmatively authorized by the Secretary's regulations. But § 1320c–9(a)(2) does not permit the Secretary to impose his own nondisclosure requirements; rather, it authorizes the Secretary to promulgate regulatory *exceptions* to the general nondisclosure requirement. Other exceptions

are contained in the statute itself, including the exception for disclosures "necessary to carry out the purposes of this part." *Id.* § 1320c–9(a)(1). Since one of those "purposes" is specified in § 1320c–3(a)(14), a disclosure made pursuant to that section cannot fairly be said to abrogate the statutory scheme.

The government's second argument invokes the canon that, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). According to the government, "Congress has demonstrated time and again throughout the PRO statute that it knows how to require, in plain language, the disclosure of otherwise confidential PRO peer review *results* or *findings*," by using either of those two words rather than "disposition." Appellants' Br. at 19 (emphasis added).[14]

The problem with this argument is that neither of those two words, "results" or "findings," is materially plainer—or more substantive—in meaning than the word "disposition." Indeed, each is a synonym for the latter. *See, e.g.*, ORAN'S DICTIONARY OF THE LAW, at 134 (defining "disposition" as "[f]inal settlement or result"); BURTON'S LEGAL THESAURUS, at 187 (listing "finding" as a synonym for "disposition").[15] And

---

[14] *See, e.g.*, 42 U.S.C. § 1320c–3(e)(3)(A)(ii) (1982 & Supp. IV 1986) (requiring a PRO that has reviewed a hospital's denial of inpatient care to provide the patient with "notice" of the "results of the review"), *repealed by* Pub. L. No. 106–554 § 521(c), 114 Stat. 2763 (2000); 42 U.S.C. § 1320c–3(a)(9)(B) (requiring a PRO that finds a care deficiency to notify the appropriate state licensing boards of its "finding and of any action taken as a result of the finding"); *id.* § 1320c–3(a)(6)(B)(ii) (directing each PRO to "publish" and "distribute" a report that includes its "findings with respect to the types of cases in which [it] has frequently determined" that services did not meet professionally recognized standards or were otherwise improper).

[15] *See also Tyler v. Cain*, 533 U.S. 656, 663 n.4 (2001) (describing "holdings" as including "the *final disposition* of a case as well as

because we could just as readily conclude that more detail is required to reveal the "disposition" of an investigation than merely to disclose its "results," application of the *Russello* canon to this statute is simply indeterminate.[16]   Accordingly, we agree with the district court that, in this case, Congress' use of slightly different words to describe various reporting requirements shows little more than that the legislature employed a modestly varied vocabulary to express similar meanings. *Public Citizen*, 151 F. Supp. 2d at 74.   Moreover, "[e]ven if Congress can be presumed to have intended that different amounts of information be provided" by the use of the different words, "there is no basis to infer that . . . the term 'final disposition' should be limited to nothing more than a procedural fact." *Id.*

The government's third contention is that requiring disclosure of the results of PRO reviews would "effectively nullif[y] Congress' prohibition on the discovery" of sensitive PRO information.   Appellants' Br. at 22.   That prohibition is contained in § 1320c–9(d), which was enacted four years after § 1320c–3(a)(14) and reads as follows:

> No document or other information produced by such an organization in connection with its deliberations in making determinations under section 1320c–3(a)(1)(B) or 1320c–5(a)(2) . . . shall be subject to subpoena or discovery in any administrative or civil proceeding. . . .

the preceding determinations necessary to *that result*" (internal quotation marks and emphasis omitted;   emphasis added)); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (Scalia, J., concurring) (describing a particular statutory interpretation both as "an absurd, and perhaps unconstitutional result" and as "an unthinkable disposition").

[16] Application of the canon to the use of the word "findings" is further problematic because the sections that contain it were not enacted until after § 1320c–3(a)(14) became part of the PRO statute in 1986. *See* Pub. L. No. 101–508 § 4205(d)(1), 104 Stat. 1388 (1990) (enacting 42 U.S.C. § 1320c–3(a)(9)(B));   Pub. L. No. 100–203 § 4094(c), 101 Stat. 1330 (1987) (enacting 42 U.S.C. § 1320c–3(a)(6)(B)(ii)).

42 U.S.C. § 1320c–9(d).[17] The government argues that § 1320c–9(d) bars disclosure of any document produced by a PRO "in connection with its deliberations," and further argues that the complaint response contemplated by the district court constitutes just such a document.

It is plain on the face of this section, however, that the district court's interpretation of § 1320c–3(a)(14) cannot "nullify" § 1320c–9(d), because the latter has no application to a document that is disclosed pursuant to § 1320c–3(a)(14).[18] Section 1320c–9(d) expressly protects the described documents against being subject to "subpoena or discovery." It does not insulate them from compliance with the statutory command of § 1320c–3(a)(14).

Indeed, if the government's construction of § 1320c–9(d) were correct, then it would not only bar a PRO from issuing the kind of letter contemplated by the district court, but would also bar it from issuing the letters that Excel actually sent to Mr. Shipp. *See supra* Part I.B. If the letter contemplated by the district court must be viewed as being produced "in connection with" a PRO's deliberations, then surely the actual letters must be as well. Section 1320c–9(d) mentions neither the degree of substantive detail revealed by a document nor the consent of the practitioner as a factor in its vulnerability to subpoena. It simply states that "no" document "produced by such an organization in connection with its deliberations" is subject to discovery. 42 U.S.C. § 1320c–9(d) (emphasis added).

---

[17] The referenced sections, § 1320c–3(a)(1)(B) and § 1320c–5(a)(2), contain general delegations of authority to PROs to conduct quality of care reviews.

[18] It is also questionable whether a section like § 1320c–9(d), which was enacted four years after § 1320c–3(a)(14), can be used to constrain the meaning of the earlier provision. There is certainly no ground for believing that § 1320c–9(d) repealed § 1320c–3(a)(14), even partially. *See County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 262 (1992) ("[I]t is a cardinal rule that repeals by implication are not favored." (internal quotation marks omitted)).

Nor is the logical difficulty of the government's construction limited to the disclosure required by § 1320c–3(a)(14). That section is just one of several mandating specific disclosures. *See, e.g., id.* § 1320c–3(a)(9)(B) (requiring disclosure to state boards); *see also* PRO Manual § 5035(A) (requiring PROs to inform the complainant of "findings" relating to institutional providers). Because § 1320c–9(d) provides exceptions for none of these, it is not reasonable to read it as governing the disclosure of documents in any context other than that expressly covered by its terms: namely, disclosure in response to subpoena or other administrative or civil discovery mechanism.

Finally, the government argues more generally that it would make no sense for Congress to require disclosure to a beneficiary complainant of a document that may not be disclosed in discovery to a civil litigant. They make a similar argument based on another provision of § 1320c–9(a), which exempts PRO documents from the requirements of the Freedom of Information Act (FOIA), 5 U.S.C. § 552. But it is hardly surprising that Congress would permit disclosure to the party with the most direct interest in the information— the person who received the medical services at issue and whose complaint initiated the investigation—while barring disclosure to others, or even to the same recipient in a litigation context. Indeed, FOIA itself provides an example of such a statutory scheme. Although certain files regarding individuals are generally unavailable to FOIA requesters, the Privacy Act, 5 U.S.C. § 552a, permits requesters to obtain such information pertaining to themselves.[19] Moreover, al-

---

[19] *Compare* 5 U.S.C. § 552(b)(6) (FOIA exemption for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"), *with id.* § 552a(d)(1) (Privacy Act requirement that an agency permit an individual access "to his record or to any information pertaining to him"). *See Wren v. Harris*, 675 F.2d 1144, 1146 (10th Cir. 1982) ("[T]he [Privacy Act] provides rights to the individual with respect to his own records greater than the rights of the public generally.").

though "[d]iscovery limitations" may generally bar the production of certain documents in civil or criminal litigation, such limitations "do not apply when FOIA requests are presented in a discrete" FOIA action. *North v. Walsh*, 881 F.2d 1088, 1096 (D.C. Cir. 1989).[20]

In sum, we find no inconsistency between the requirement that a PRO advise a complainant of the results of his complaint and the remainder of the PRO statute. To the contrary, such a requirement is very much in keeping with the legislative scheme.

### C

We turn next to an examination of the legislative history. Each side points to a different precursor bill as evidence that its interpretation of the final statute is correct. Although we do not find this exercise in legislative tracking to be particularly productive, there is another element of the legislative history that *is* helpful.

As the government points out, the original House version of § 1320c–3(a)(14) would have required a PRO to "inform the [complainant] of the organization's conclusions . . . and final disposition of the complaint." H.R. 5300, 99th Cong. § 10241(e)(1) (1986). Because the section as enacted speaks only of the complaint's "final disposition," the government contends that Congress must have rejected the House's requirement that the complainant be advised of the PRO's conclusions. It further insists that the only meaning left for "disposition" is a procedural one. Public Citizen, on the other hand, points out that the original Senate bill contemplated a purely procedural notification similar to that propounded by HCFA, requiring the PRO merely to "inform the individual . . . that the organization has received the complaint and will take appropriate action." S. 2706, 99th Cong. § 633(b)(1)

---

[20] While we have no occasion to decide the issue here, we note that the fact that the results of a PRO's reviews must be disclosed to a beneficiary pursuant to § 1320c–3(a)(14) does not necessarily mean that they are admissible against a practitioner in civil litigation.

(1986). Public Citizen contends that the absence of this language from the enacted version indicates Congress' rejection of purely procedural notice.

We are not persuaded by either argument. The deletion of the word "conclusions" from the House draft could simply indicate that Congress regarded the use of both "conclusions" and "disposition" as redundant, or that the legislature contemplated a more bare-bones but still substantive notification: just the bottom-line result (disposition), unencumbered by the PRO's reasoning (conclusions). On the other hand, the deletion of the Senate provision requiring notification that the PRO "has received" the complaint would not by itself demonstrate that Congress would have disapproved of HCFA's procedural construction—which requires notification not only that the complaint has been "received" but also that it has been "disposed of."

Hence, if Congress had left us with these precursor bills alone, without any explanation for its ultimate resolution of the matter, our understanding would not be much advanced. Fortunately, Congress provided one further piece of information. The Conference Committee explained the final conference agreement as follows: "If a PRO makes a final determination with respect to whether the services which are the subject of a complaint did or did not meet professionally recognized standards of care, the PRO would be required to *inform the beneficiary . . . of any final action taken*." H.R. CONF. REP. NO. 99–1012, at 361 (1986) (emphasis added). It would be a particularly cramped reading to construe the italicized phrase as requiring nothing more than notification that final action *was* taken, rather than notification of *what* that action was.

The government poses one final variant on the argument from legislative history: implicit congressional ratification. In support, it cites *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982), in which the Supreme Court said: "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without

change." The government contends that because the PRO Act was amended numerous times after the 1986 addition of § 1320c–3(a)(14), during which period HCFA was interpreting that section to require nothing more than procedural notification, Congress' failure to statutorily reverse that interpretation demonstrates its implicit concurrence.

The Supreme Court, however, has added several caveats to the ratification canon that render it of limited utility here. *See Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001) ("Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care.").[21] First, the canon is of little assistance here because, unlike *Merrill Lynch*, this is not a case in which "Congress re-enact[ed] a statute without change." 456 U.S. at 382 n.66. Congress has neither re-enacted the entire PRO statute nor amended § 1320c–3(a)(14) at all. Rather, it has simply enacted a series of isolated amendments to other provisions. *See* Appellants' Br. at 28 n.14 (collecting amendments). *Compare Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) ("[W]hen Congress has not comprehensively revised a statutory scheme but has made only isolated amendments, . . . [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation." (internal quotation marks omitted)), *with Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (according weight where "Congress has frequently amended or reenacted *the relevant provisions* without change" (emphasis added)).

Moreover, because "the rationale of [this] canon must be, either that those in charge of the amendment are familiar with existing rulings, or that they mean to incorporate them,"

---

[21] *See also Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (noting that "we recently criticized *Curran*'s reliance on congressional inaction, saying that '[a]s a general matter . . . [the] argumen[t] deserve[s] little weight in the interpretive process'" (quoting *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994))).

*Thompson v. Clifford*, 408 F.2d 154, 164 (D.C. Cir. 1968) (internal quotation marks omitted), the government's argument has little weight absent some evidence of (or reason to assume) congressional familiarity with the administrative interpretation at issue.[22] The government points to no such evidence here. Even if it could be assumed that Congress was aware of HCFA's more high-profile interpretations of the Medicare statute, its interpretation of § 1320c–3(a)(14) would hardly qualify. As we have noted above, no formal regulation addressed the question; indeed, if any "interpretation" existed at all, it would have to have been teased out of the model letter and instructions buried deep within the PRO Manual.

Finally, we note that HCFA's most prominent presentation of its position on the issue during much of the relevant period was actually one in which the agency took the *opposite* view from that which it maintains on this appeal, and precisely the position that Public Citizen urges us to adopt. In 1989, HCFA published a notice of proposed rulemaking (NPRM) soliciting comments on a proposed regulation that would have required PROs to "inform the beneficiary or the beneficiary's representative whether the quality of care meets professionally recognized standards of health care, and, if not, the corrective action to be taken." Medicare and Medicaid Programs; Denial of Payment for Substandard Quality Care and Review of Beneficiary Complaints, 54 Fed. Reg. 1956, 1964 (Jan. 18, 1989). In that NPRM, HCFA stated that while it had "considered precluding PROs from providing any information to the beneficiary that might identify the concerned physician or practitioner," the agency rejected that position because "*we believe that section 1154(a)(14) of the Act [42 U.S.C. § 1320c–3(a)(14)] requires that the information discussed above be provided to the beneficiary.*" *Id.* at 1960 (emphasis added). Although the proposed rule was never promulgated,

---

[22] *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) (holding that where "there is no . . . evidence to suggest that Congress was even aware of the [agency's] interpretive position[,] . . . we consider . . . re-enactment to be without significance" (quotation marks omitted)).

it remained pending at least through 1993,[23] and a similar rule remained under consideration through 2001; the latter was not withdrawn until after the institution of this lawsuit.[24]

The interpretation contained in the agency's proposed rule does not, of course, bind it here. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986). But it does effectively counter the government's argument that Congress implicitly ratified the contrary interpretation by not amending the statute. If there is any prospect that Congress was aware of the agency's views regarding the meaning of § 1320c–3(a)(14) during the relevant period, what it would have known was that the agency was espousing views similar to those of Public Citizen and was moving toward formalizing those views in a regulation. If Congress shared those views, it would have had no reason to amend the law.

D

Finally, the government urges us to consider the congressional purpose underlying the PRO statute. We conclude, however, that the argument based on legislative purpose cuts strongly against the government's position.

The government points to the various confidentiality provisions of the statute, and argues that they were intended both

---

[23] *See* Unified Agenda, 58 Fed. Reg. 56,355, 56,355 (Oct. 25, 1993) (mentioning 1989 proposed rule).

[24] *See* Unified Agenda, 63 Fed. Reg. 21,989, 21,996 (Apr. 27, 1998) (announcing that HCFA was considering issuing a proposed rule that "would permit the disclosure of PRO information about physicians . . . without their permission to the extent necessary to comply with section 1154(a)(14) of the Social Security Act [42 U.S.C. § 1320c–3(a)(14)]," and noting that "[t]his section requires PROs to conduct reviews of beneficiary complaints about the quality of services . . . and inform each beneficiary of the final disposition of his or her complaint"); 63 Fed. Reg. 61,735, 61,737 (Nov. 9, 1998) (referencing same rule); 64 Fed. Reg. 64,411, 64,424 (Nov. 22, 1999) (same); 65 Fed. Reg. 73,838, 73,844 (Nov. 30, 2000) (same); 66 Fed. Reg. 25,466, 25,468 (May 14, 2001) (noting withdrawal of 1998 proposed rule as of February 13, 2001).

to protect the privacy of health care practitioners and to assure the confidentiality necessary to encourage practitioners to evaluate their peers honestly. We do not doubt that these considerations were important to Congress and that they underlie the confidentiality provisions of the statute. *See Armstrong v. Dwyer*, 155 F.3d 211, 219 (3d Cir. 1998). As we have discussed above, however, the confidentiality provisions are not absolute; they contain both specific exceptions, *see* 42 U.S.C. § 1320c–9(a)(3), and the general exception for disclosures "necessary to carry out the purposes of this part," *id.* § 1320c–9(a)(1). The fact that § 1320c–3(a)(14) breaches absolute confidentiality by requiring a narrow disclosure to beneficiaries is no more remarkable than, for example, the requirement of § 1320c–3(a)(9)(B) that disclosures be made to a physician's state licensing board.

Moreover, although protecting confidentiality was undoubtedly the purpose of the PRO statute's confidentiality provisions, that was hardly the only—or even the overriding—purpose of the statute as a whole. *See* S. REP. NO. 97–494, at 41 (1982) (stating that PRO contracts are for "the purpose of promoting the effective, efficient, and economical delivery of quality health care services under Medicare"). And when we turn to the specific provision at issue here, § 1320c–3(a)(14), the sole evidence we have of congressional purpose is the Conference Committee's statement that the section was intended to "[i]mprove peer review responsiveness to beneficiary complaints." H.R. CONF. REP. NO. 99–1012, at 361 (1986). Indeed, § 1320c–3(a)(14) is expressly phrased as a requirement that the PRO provide information; considerations of confidentiality are not mentioned at all.

It is hard to see how § 1320c–3(a)(14), if interpreted as the government suggests, would improve peer review responsiveness to beneficiary complaints. HHS's own Office of Inspector General (OIG) has concluded that HCFA's confidentiality policy "hinder[s] the PROs' ability to be responsive to beneficiaries who complain." HHS, OIG, The Beneficiary Complaint Process of the Medicare Peer Review Organizations, at 6 (Nov. 1995); *see* HHS, OIG, The Medicare Beneficiary Complaint Process: A Rusty Safety Valve, at ii, 16 (Aug.

2001) (stating that "current procedures ... continue to preclude the PROs from responding substantively," resulting in a deficiency in "responsiveness").[25] The government contends that, even under its limited interpretation, § 1320c–3(a)(14) "directly improve[s] PRO responsiveness to beneficiary complaints" because it makes the investigation of beneficiary complaints mandatory—which was not the case prior to 1986. Appellants' Br. at 32. But the requirement to investigate comes from the first sentence of § 1320c–3(a)(14), not the second. *See* 42 U.S.C. § 1320c–3(a)(14) (first sentence) ("The organization shall conduct an appropriate review of all written complaints.... "). And we, of course, are required to "give effect, if possible, to every clause and word of a statute." *Moskal v. United States*, 498 U.S. 103, 109–10 (1990) (citations and internal quotation marks omitted).

Indeed, it is hard to see what purpose the second sentence of § 1320c–3(a)(14) would serve at all under the government's construction. According to HCFA, that sentence merely requires the PRO to advise a complaining beneficiary of three things: that the complaint was received, that it was investigated, and that corrective action will be taken if appropriate. But the beneficiary could learn the first of these simply by including a Certified Mail Return Receipt along with his complaint, and the latter two promise nothing more than that the agency will do what the law requires. As both Public Citizen and HHS's Inspector General suggest, this seems little more than an empty gesture. *See* OIG, The Medicare Beneficiary Complaint Process, at ii (concluding that the PRO complaint process "fails to provide a meaningful response to complainants"). Because "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect," *Stone v. INS*, 514 U.S. 386, 397 (1995), we reject the government's interpretation of § 1320c–3(a)(14) as wholly unpersuasive.

---

[25] We agree with the government that the PRO Act delegated policymaking authority to the Secretary and not to the OIG. We cite the OIG's views—supported, as they are, by that Office's experience and expertise—not because they legally command our deference, but because we find them logically persuasive.

IV

We conclude that, to "inform" a Medicare beneficiary of the organization's "final disposition" of the complaint as required by § 1320c–3(a)(14), a PRO must notify the complainant of the results of its review. At a minimum, this means that the PRO must disclose its determination as to whether the quality of the services that the recipient received met "professionally recognized standards of health care." 42 U.S.C. § 1320c–3(a)(14). We therefore affirm the judgment of the district court, which held that the provisions of the PRO Manual prohibiting disclosure of the results of § 1320c–3(a)(14) investigations are invalid because they are contrary to law. *Public Citizen*, 151 F. Supp. 2d at 77.[26]

At one place in its brief, Public Citizen suggests that the term "final disposition" goes further than this, requiring the PRO to advise the complainant not only of its final judgment regarding the quality of care received, but also of the corrective action that it has taken. *See* Appellee's Br. at 15. While this suggestion certainly represents a reasonable elaboration of the meaning of the term, it does not have—as does the phrase "meet[s] professionally recognized standards of health care"—the virtue of coming verbatim out of the first and third sentences of § 1320c–3(a)(14). We need not decide today, however, whether this additional information is statutorily required. The district court's order did not expressly require it, and Public Citizen has not sought modification of that order. Moreover, because even our more limited "disposition" will require HCFA to rethink the kind of notification

---

[26] The district court also held invalid those of "HCFA's regulations" that prohibit such disclosures. 151 F. Supp. 2d at 77. As noted in Part I.A, however, the agency's confidentiality regulations incorporate the statutory exception for disclosures "necessary to carry out the purposes" of the PRO statute. 42 U.S.C. § 1320c–9(a); *see* 42 C.F.R. § 480.103(b)(1). Because the disclosures required by § 1320c–3(a)(14) fall within this exception, *see supra* Part III.B, that portion of the district court's decision is without effect.

required of PROs, there remains ample room for an administrative resolution of this question.

The judgment of the district court is

*Affirmed.*