**METRO MACHINE CORP., Plaintiff,**

v.

**UNITED STATES SMALL BUSINESS ADMINISTRATION, and Michael P. McCale,[1] in his official capacity as Associate Administrator of the HUBZone Program Defendants.**

No. CIV.A.2:03 CV 838.

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 26, 2004.

---

**1.** Plaintiff erroneously refers to Michael P. McHale as Michael P. McCale.

Gary A. Bryant, Esquire, Willcox & Savage, PC, Norfolk, Terry L. Albertson, Esquire, Crowell & Moring, LLP, Washington, DC, Counsel for Plaintiff.

Michael A. Rhine, Assistant U.S. Attorney, Norfolk, Glenn P. Harris, Chief Counsel for Enforcement, U.S. Small Business Administration, Washington, DC, Counsel for Defendants.

### MEMORANDUM OPINION
### AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on cross-motions for summary judgment. Plaintiff, Metro Machine Corp. ("Metro

Machine"), seeks a declaration that the decision of defendants, United States Small Business Administration ("SBA") and Michael P. McHale, Associate Administrator of the HUBZone Program, to decertify Metro Machine as a qualified HUBZone small business concern was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, pursuant to 5 U.S.C. § 706(2)(A). For the reasons set forth below, Metro Machine's motion for summary judgment is **DENIED**. Defendants' motion for summary judgment is **GRANTED**.

### I. Factual and Procedural History

#### A. The HUBZone Program

Congress created the Historically Underutilized Business Zone ("HUBZone") program in 1997 to provide federal contracting assistance to qualified small business concerns ("SBCs") located in geographic areas that are considered "HUBZones."[2] The purpose of the program is to "increase employment opportunities, economic development, and investment in areas where unemployment has historically been above national averages." 13 C.F.R. § 126.100 (2002). Small businesses that are "qualified HUBZone SBCs" are given a ten percent price evaluation preference in qualifying for federal government contracts.[3] By statute, in order to be certified as a qualified HUBZone SBC, a small business must be exclusively owned and controlled by United States citizens, have its principal office located in a HUBZone, and at least 35% "of its employees" must reside in a HUBZone. 15 U.S.C.A. §§ 632(p)(3)(A) and (p)(5)(A)(i)(I)(aa) (West Supp.2003). The statute does not define who should be counted as an "employee" of the SBC.

SBA is charged with administering the HUBZone program. Title 15 U.S.C.A. § 632(p)(5)(A)(ii)(II) (West Supp.2003) provides that if any of the SBC's assertions that it qualifies for the preferred HUBZone status is "determined by [SBA] to be materially false," then the SBC shall not be awarded "qualified HUBZone SBC" status. In order to carry out its task of administering the HUBZone program, Congress provided that SBA "shall establish procedures relating to the filing, investigation, and disposition by [SBA] of any challenge to the eligibility of a small business concern to receive assistance under this section." 15 U.S.C.A. § 657a(c)(1)(A) (West Supp.2003). Further, Congress ordered that SBA "shall establish procedures" for the purpose of "verification by the [SBA] of the accuracy of any certification made or information provided to the SBA ... under section 632(p)(5) of this title." 15 U.S.C. § 657(c)(1)(B) (West Supp.2003).

SBA has promulgated regulations for purposes of administering the HUBZone program. *See* 13 C.F.R. § 126.100 through § 126.900. The regulations state that, to be certified as a qualified HUBZone SBC, "[a]t least 35 percent of the concern's employees must reside in a HUBZone." 13 C.F.R. § 126.200(b) (2002). The regulations provide that SBA program examiners will conduct program examinations to verify that any qualified HUBZone SBC meets the requirements

---

**2.** *See* HUBZone Act of 1997, Pub.L. No. 105–135, 111 Stat. 2627 (codified in scattered sections of titles 10, 12, 15, 31, 41, 42, and 49 of the United States Code).

**3.** In other words, if a HUBZone SBC's bid was $109, and a non-HUBZone concern's bid

was $100, the HUBZone SBC would be awarded the contract. This is because the non-HUBZone concern's bid of $100 would, under the statute, be considered a bid of $110.

set forth in § 126.200, and may examine whether the SBC meets the employee percentage requirement. 13 C.F.R. § 126.401 (2002). Further, the regulations define "employee" for purposes of qualified HUBZone SBC certification as follows:

> *Employee* means a person (or persons) employed by a HUBZone SBC on a full-time (or full-time equivalent), permanent basis. Full-time equivalent includes employees who work 30 hours per week or more. Full-time equivalent also includes the aggregate of employees who work less than 30 hours a week, where the work hours of such employees add up to at least a 40 hour work week. *The totality of the circumstances,* including factors relevant for tax purposes, will determine whether persons are employees of a concern. Temporary employees, independent contractors or leased employees are not employees for these purposes.

13 C.F.R. § 126.103 (2002) (emphasis added). A qualified HUBZone SBC can have affiliates under common control "provided that the aggregate size of the concern and all its affiliates is small" as defined by SBA regulations. 13 C.F.R. § 126.204 (2002). Title 13 C.F.R. 121.101(a) provides that a business entity is "small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns," if that entity meets industry-specific size standards set forth in 13 C.F.R. § 121.201. Under § 121.201, a business involved in "Ship Building and Repairing" is "small" if it employs 1,000 or fewer individuals.

B. *Metro Machine's Decertification*

Metro Machine's main business is overhauling and repairing ships for the United States Navy. It is headquartered in Norfolk, Virginia, and has shipyards in Norfolk, Philadelphia, and Erie, Pennsylvania. Metro Machine became interested in the HUBZone program in 2002. However, it recognized at that time that it did not meet the HUBZone requirement that 35% of its employees reside in a HUBZone ("the 35% requirement").

In order to meet the 35% requirement, Metro Machine transferred 182 non-management employees to a dormant, wholly-owned subsidiary, Metro On–Call, that had been created for other reasons in 1998. Of those 182 employees, 171 of them did not reside in a HUBZone. At the time Metro Machine transferred the employees, it entered into an agreement with Metro On–Call guaranteeing that the transferred employees would be available at all times to work on Metro Machine's projects. Further, Metro Machine revised a collective bargaining agreement with its union to ensure that employees transferred to Metro On–Call would not lose any of the rights that they would have had under that agreement. The employees transferred to Metro On–Call perform the same work, in the same locations, and under the same supervisors as they did before the transfer. After the transfer of employees to Metro On–Call, the remaining Metro Machine workforce met the 35% requirement.

Metro Machine applied for certification to the HUBZone Program in May, 2002, but did not disclose at that time the recent transfer of employees to Metro On–Call. SBA certified Metro Machine as a HUBZone SBC on July 12, 2002. On August 28, 2002, Edward Correia ("Correia"), an attorney for Norshipco, one of Metro Machine's competitors, wrote a letter to SBA raising questions about Metro Machine's eligibility for the HUBZone program. Correia contended that Metro Machine did not meet the 35% requirement, and provided SBA with a number of documents, including a copy of the agreement between Metro On–Call and the local union, Boilermakers Local 1999. (Joint App.

Tab 4.) The agreement, dated May 31, 2002, provides that

> it is mutually agreed the creation of METRO ON–CALL, and the movement of current bargaining unit employees into this wholly-owned subsidy [sic] of METRO MACHINE CORPORATION will have no adverse affect [sic] on current terms and conditions of employment, including, but not limited to: Seniority, Layoff and Recall, Discipline, Shop Assignments, and Pension Payments.

(*Id.* (commas added).)

Pursuant to 13 C.F.R. § 126.401, SBA initiated an investigation into Metro Machine's eligibility for qualified HUBZone SBC status. In response to an SBA request for information regarding Metro On–Call, Metro Machine provided a "Metro On–Call Record of Action in Writing," which specifically provides that Metro On–Call is being capitalized and organized as a subcontractor of Metro Machine "in connection with [Metro Machine's] applying to the [SBA] to qualify as a HUBZone contractor," with the purpose of providing Metro Machine with "certain skilled labor functions at Metro [Machine]'s Norfolk Shipyard." (Joint App. Tab 15.)

By letter dated July 14, 2003, SBA notified Metro Machine of its proposal to decertify Metro Machine from the HUBZone program on the basis that Metro Machine did not meet the 35% requirement. The proposed decertification letter advised Metro Machine that SBA was relying on 13 C.F.R. § 126.103, the agency regulation which provides that in determining who is an "employee" under the HUBZone regulations, SBA may consider the "totality of the circumstances." (Joint App. Tab 32.) The letter further advised that this totality of the circumstances test involved some or all of eleven factors.[4] (*Id.*) Though the letter did not make reference to any other agency document, the same eleven factors were originally set forth by SBA in "Policy Statement No. 1," which was promulgated in 1986 to assist SBA program examiners

---

4. The July 14, 2003 proposed decertification letter stated:

> [t]he "totality of the circumstances" that serves as the basis for this proposed decertification encompasses, but is not limited to, such considerations as:
> (1) Does the company engage and select the employees?
> (2) Does the company pay the employees wages and/or withhold employment taxes and/or provide employment benefits?
> (3) Does the company have the power to dismiss the employees?
> (4) Does the company have the power to control and supervise the employees' performance of their duties?
> (5) Did the company procure the services of the employees from any employment contractor involved in a close proximity to the date of application for HUBZone certification or the date of a HUBZone program review?
> (6) Did the company dismiss the employees from its own payroll and replace them with the employees from any employment contractor involved? Were they replaced soon after their dismissal?
> (7) Are the individual employees supplied by any employment contractor involved the same individuals that were dismissed by the company?
> (8) Do the employees possess a type of expertise or skill that other companies in the same or similar lines of business normally employ in-house (as opposed to procuring by sub-contract or through an employment contractor)?
> (9) Do the employees perform tasks normally performed by the regular employees of the business or which were previously performed by the company's own employees?
> (10) Were the employees procured through an employment contractor to do other than fill in for regular employees of the company who are temporarily absent?
> (11) Does the contract with the independent contractor have a term based on the term of an existing Government contract?
> (Joint App. Tab 32.) (numbering added).

in determining under 13 C.F.R. § 121.106(a) who an "employee" of a company is for purposes of deciding whether the business is "small" as defined by 13 C.F.R. § 121.106(b). 51 Fed.Reg. 6099 (Feb. 20, 1986).[5]

In response, Metro Machine acknowledged that the company had transferred the 182 employees to Metro On–Call "[i]n order to meet the HUBZone requirements." (Joint App. Tab 33.)[6] Metro Machine stated that there were no factual disputes, but argued that SBA did not have the legal authority to decertify Metro Machine on the basis that it proposed. (*Id.*) Metro Machine's argument was based on 13 C.F.R. § 126.204, which states that qualified HUBZone SBCs may have affiliates, so long as the aggregate size of the businesses is "small" by SBA regulation standards. According to Metro Machine, this regulation was amended in 2001 specifically to permit businesses to shuffle employees to affiliates in order to obtain qualified HUBZone SBC status. Metro Machine also argued that interpreting § 126.103 to incorporate the eleven-factor test from Policy Statement No. 1 did not further the purposes of the HUBZone legislation.

In a Final Decision Letter dated October 7, 2003, SBA advised Metro Machine that it was being decertified from the HUBZone Program, pursuant to 13 C.F.R. § 126.103. Using some of the eleven factors, SBA determined that employees of Metro On–Call should be counted as employees of Metro Machine for purposes of the HUBZone Program's 35% require-

ment. In particular, SBA found that: (1) Metro Machine dismissed employees from its own payroll and replaced them with employees of Metro On–Call immediately after their dismissal; (2) the individual employees supplied by Metro On–Call were the same individuals who were dismissed from Metro Machine; (3) Metro Machine has the power to control and supervise Metro On–Call employees in the performance of their duties; (4) Metro Machine engaged and selected Metro On–Call employees; (5) Metro Machine has the power to dismiss Metro On–Call employees; (6) Metro On–Call employees possess skill and expertise that other companies in the same line of business normally employ in-house; and (7) Metro On–Call employees perform tasks that were formerly performed by Metro Machine employees. (Joint App. Tab 34.) The decertification letter further found that "[a]lthough some of the factors [enumerated in the proposed decertification letter] specifically refer to 'employment contractors,' the factors are equally applicable to transactions between a parent and its wholly-owned subsidiary." (*Id.*)

In response to a request from two Congressmen, SBA met with representatives of Metro Machine on October 27, 2003, to reconsider its decision to decertify the company. Metro Machine again explained its position, and the SBA agreed to take the matter under advisement. By letter dated November 21, 2003, SBA reaffirmed its decision to decertify Metro Machine.

On November 26, 2003, Metro Machine filed a verified complaint for a declaratory

---

**5.** In 1986, what is now 13 C.F.R. § 121.106 was found at 13 C.F.R. § 121.2(b). *See* 13 C.F.R. § 121.2(b) (1986). In order to simplify, clarify, and streamline Part 121 of title 13, in 1996 SBA reorganized and renumbered § 121.2(b), creating 13 C.F.R. §§ 121.106(a) and (b). 61 Fed.Reg. 3280 (Jan. 31, 1996). The regulation was not substantively revised.

*Id.* To avoid confusion, current citations are used throughout this Memorandum Opinion and Final Order.

**6.** To Metro Machine's credit, it has never denied or shielded its intent in transferring the employees to Metro On–Call.

judgment and injunctive relief,[7] or, in the alternative, for expedited relief, against SBA and McHale. The complaint seeks a declaration that SBA's decision to decertify Metro Machine as a qualified HUBZone SBC was clearly erroneous and lacked a basis in fact or law. Also on November 26, 2003, Metro Machine filed a motion for a preliminary injunction, or, in the alternative, for expedited relief on its request for a declaratory judgment. On December 23, 2003, Metro Machine filed a motion for summary judgment. Also on December 23, 2003, SBA and McHale filed a motion to dismiss, or, in the alternative, for summary judgment. On January 5, 2004, all parties filed memoranda in opposition to their opponent's motion for summary judgment. On January 6, 2004, a joint appendix was filed with the court to facilitate a ruling on the cross-motions for summary judgment. On January 9, 2004, all parties filed reply briefs, and a hearing on the cross-motions for summary judgment was held on February 5, 2003. The motions are ripe for review.

## II. Standard of Review

### A. Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Alexander,* 85 F.3d 146, 150 (4th Cir.1996). When faced with cross-motions for summary judgment, the court must review each motion separately on its own merit to determine whether either of the parties deserves judgment as a matter of law. *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003). The parties to this matter have agreed on all the material facts. (*See* Pl.'s Reply Mem. in Support of its Mot. for Summ. J., at 1 ("the material facts in this case are undisputed"); Tr. of Proceedings, Feb. 5, 2004 (Hearing on Cross–Motions for Summ. J.), at 2 ("[a]s the parties have agreed, there are no facts in dispute")). Therefore, only legal questions remain for the court to decide.

### B. Administrative Law

#### 1. Review under 5 U.S.C. § 706(2)(A)

Title 5 U.S.C. § 706(2)(A) authorizes federal courts to set aside a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[8] It is well-established that "[t]he arbitrary and capricious standard of 5 U.S.C. § 706(2)(A) is a narrow standard of review," in which the court performs "only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with con-

---

7. In exchange for SBA's agreement to proceed on an expedited schedule, Metro Machine is no longer seeking an injunction. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J., at 13 n. 13.

8. 5 U.S.C. § 706(2)(A) provides that
   [t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, inter-

pret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—(2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
5 U.S.C.A. § 706(2)(A) (1996).

trolling statutes," and "whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see Wilson v. Office of Civilian Health and Med. Programs*, 65 F.3d 361, 364 (4th Cir.1995) (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814). In conducting this review, the court is "not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814.

## 2. Deference to Agency Interpretations

■ In the course of determining whether agency action was arbitrary and capricious, courts are oftentimes confronted with agency interpretations of statutes and regulations. In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court established a deferential two-step analysis for determining the validity of agency interpretations of statutes which carry the force of law. First, an agency action that is contrary to the express statutory intent of Congress is void. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. Second, where a statute is silent or ambiguous, courts should defer to agency regulations and decisions that are "permissible interpretations of the statutory language." *Id.* at 843, 104 S.Ct. 2778. The judicial deference given to agency interpretations of statutes in this second step of the *Chevron* analysis is commonly referred to as "*Chevron* deference."

■ However, the Supreme Court has made it clear in recent years that *Chevron* deference is not implicated every time a court reviews an agency action to determine if it is consistent with the statute which authorized it. Instead,

administrative interpretation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.

*United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). In all other cases, "[t]he weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 228, 121 S.Ct. 2164 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). In particular, "interpretations contained in policy statements, agency manuals, and enforcement guidelines ... are beyond the *Chevron* pale." *Id.* at 235, 121 S.Ct. 2164 (internal quotation omitted).

The first step of *Chevron* analysis must be conducted in every case; if agency action is in direct conflict with a statutory command, then the court must set aside that action as contrary to law. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *see also Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (stating that court must set aside agency action that conflicts with a statute). However, the second step of the *Chevron* analysis applies only where the agency action at issue in the litigation was directly predicated on an interpretation of the relevant statute. *See Mead*, 533 U.S. at 228, 121 S.Ct. 2164 (explaining the proper deference accorded to "administrative implementation of a

particular statutory provision"). In other words, the court must determine whether *Chevron* deference or the lower standard of deference of *Skidmore* and *Mead* applies only where the agency interpreted a statute in the course of taking the disputed action.

■ Where the agency action was instead based on an interpretation of its own regulations, promulgated for the purpose of implementing the statutes, and where the validity of those regulations is not being challenged, the *Chevron/Mead* distinction is irrelevant. *See Sigma–Tau Pharm., Inc. v. Schwetz,* 288 F.3d 141, 146 (4th Cir.2002) ("Because Sigma–Tau raises no challenge to the validity of the regulations themselves, we have no occasion to consider the deference due to the [agency]'s interpretation of [the statute] under *United States v. Mead Corp.*"). Instead, when the question before the court is whether an agency has properly interpreted its own regulations, "[a]n agency's construction of its own regulations is entitled to substantial deference." *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986). This deference is often referred to as "*Seminole Rock* deference," after the case in which it was first articulated, *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 415, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). *See Kentuckians for Commonwealth, Inc. v. Rivenburgh,* 317 F.3d 425, 439 (4th Cir.2003). Though the court must interpret the meaning of the relevant regulations, "[t]he reviewing court does not have much leeway in undertaking this interpretation ... because the agency is entitled to interpret its own regulations, and the agency's interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)). In other words, it is not the court's task to decide which among several possible interpretations of a regulation best serves the regulatory purpose. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Deference "does not mean blind obedience," however, and no deference is due if the agency's interpretation is plainly erroneous or inconsistent with the regulation. *Md. Gen. Hosp., Inc. v. Thompson,* 308 F.3d 340, 343 (4th Cir.2002).[9] Further, a final agency decision is not entitled to *Seminole Rock* deference when it ignores a clearly established, unambiguous rule. *United States v. Deaton,* 332 F.3d 698, 709 (4th Cir.2003).

### III.  Analysis

#### A.  This Litigation Does Not Present a Chevron/Mead Issue

Because SBA's decision to decertify Metro Machine was based on the agency's interpretation and application of its own regulations, the appropriate issue for the court to consider is whether substantial deference to the agency action is due under *Seminole Rock* and its progeny. The standard of review set forth in *Skidmore* and *Mead* is simply inapplicable. Nevertheless, Metro Machine confusingly argues that this court does not owe much defer-

---

**9.** In *Maryland General Hospital,* the Fourth Circuit set aside a determination by the Department of Health and Human Services ("HHS") that a nursing home did not qualify for an exemption from statutory caps on Medicare reimbursements. *Md. Gen. Hosp., Inc.,* 308 F.3d at 348. The court found that the word "provider" in the relevant regula-tion "unambiguously refers to the business institution providing the skilled nursing services," and therefore that HHS's interpretation of the word "provider" to mean the owner of a particular asset (in this case hospital beds) used in nursing homes, was "inconsistent with the plain language of the regulation." *Id.* at 347.

ence to SBA's determination in this case, based on the *Skidmore/Mead* standard.

Metro Machine first argues that "the HUBZone statute unambiguously lists the requirements to qualify for HUBZone status and nothing in the statute suggests that the 35% residency requirement may be applied other than to the 'concern' applying for HUBZone status." (Pl.'s Mem. in Resp. to SBA's Mot. to Dismiss or for Summ. J., at 12). This argument misconceives the issue. It is precisely *because* the statute is silent on the issue of how to determine who the "employees" of a concern are that SBA promulgated 13 C.F.R. § 126.103, defining that term. In § 126.103, SBA defined "employee" in part according to the "totality of the circumstances." It was SBA's interpretation of 13 C.F.R. § 126.103 that led to Metro Machine's decertification. No interpretation of the relevant statute, 15 U.S.C. § 632, was necessary to that decision. Thus, the court has no occasion to determine whether *Chevron* deference or the lower level of deference of *Skidmore* and *Mead* is applicable. *See Sigma–Tau*, 288 F.3d at 146.

Metro Machine also argues that the court need not give much deference to the agency's decision under *Mead* and *Skidmore* because SBA used the factors contained in Policy Statement No. 1 in its determination to decertify Metro Machine.

According to Metro Machine, given that the eleven factors of Policy Statement No. 1 were used by SBA to give substance to the totality of the circumstances test of 13 C.F.R. § 126.103, and that policy statements are not entitled to *Chevron* deference, *see Mead*, 533 U.S. at 235, 121 S.Ct. 2164, SBA's interpretation of 13 C.F.R. § 126.103's totality of the circumstances test is not entitled to deference.

This argument inappropriately conflates multiple agency actions. SBA did not rely solely on Policy Statement No. 1 to make its determination.[10] Rather, because "employee" was not defined in the HUBZone statutes, SBA promulgated 13 C.F.R. § 126.103 through notice-and-comment rulemaking under § 4 of the Administrative Procedure Act of 1946, 5 U.S.C. § 553. Section 126.103 establishes that "employee" is defined in part according to the "totality of the circumstances." SBA then determined that employees of Metro On–Call should be counted as employees of Metro Machine on the basis of the discretionary standard set forth in § 126.103. SBA simply used the factors contained in Policy Statement No. 1 in order to guide its discretionary decision under 13 C.F.R. § 126.103. The way in which SBA gives substance to its own totality of the circumstances test is a matter of regulatory, not statutory, interpretation.[11]

**10.** In *Public Citizen Inc. v. U.S. Department of Health and Human Services*, 332 F.3d 654 (D.C.Cir.2003), a recent case on which Metro Machine relies heavily, the agency action was based *solely* on rules set forth in an agency guidelines manual. Finding that the rules were inconsistent with the statute they were supposed to implement, the court held the rules invalid. *Id.* at 660 ("The only agency pronouncement upon which the defendants' claim for deference relies is HCFA's PRO Manual."). That case is far different from the case at bar. Here, Metro Machine does not challenge the validity of SBA's regulations *See* Pl.'s Mem. in Resp. to SBA's Mot. to Dismiss or for Summ. J., at 8 ("Metro contests the

manner in which the SBA is applying the regulations in this case, not the validity of the regulations themselves."). Nor was SBA's determination based solely on rules contained in an agency guidelines manual. On the contrary, SBA's decision was based on its interpretation of its own valid regulation.

**11.** Under *Seminole Rock*, an agency's interpretation of its own regulations is entitled to substantial deference. Therefore, if SBA had created an entirely new set of criteria by which to evaluate the totality of the circumstances test, under *Seminole Rock* the court would not disturb the agency's interpretation unless it was plainly erroneous, contrary to

B. *SBA's Interpretation of 13 C.F.R. § 126.103 is entitled to Seminole Rock Deference*

SBA's interpretation of 13 C.F.R. § 126.103 was not plainly erroneous, inconsistent with the HUBZone regulations, or contrary to a clearly-established rule. Therefore, it is entitled to *Seminole Rock* deference.

1. **Interpreting the totality of the circumstances test of § 126.103 to incorporate the eleven factors originally set forth in Policy Statement No. 1 is not plainly erroneous or contrary to the regulations or statute.**

■ Metro Machine argues that the court should not afford *Seminole Rock* deference to SBA's interpretation of the regulations because applying the eleven factors of Policy Statement No. 1 to the totality of the circumstances test in § 126.103 is plainly erroneous and inconsistent with the HUBZone regulations. As an initial matter, the factors from Policy Statement No. 1 seem very relevant to the question of who are the "employees" of a small business concern, and they do not appear to be facially erroneous. The factors incorporate well-established tests for a principal-agent relationship, such as: whether the concern has the power to control the worker in the performance of his duties, and whether the concern hired and has the ability to fire the worker. Several of the other factors examine substance over form: whether Metro Machine dismissed workers from its payroll and immediately rehired them to do the same work from a

subsidiary; whether the subsidiary's workers do work that most other concerns in the business would have in-house workers do; and whether the workers who were dismissed from Metro Machine were replaced with the exact same people. These factors seem entirely relevant to the question of who should be counted as an employee of a small business concern for HUBZone qualification purposes. Thus, Metro Machine must show why SBA's adoption of the eleven factors for purposes of interpreting the totality of the circumstances test was impermissible given the existing regulations.

In support of this argument, Metro Machine makes a number of arguments why SBA perhaps *should not* have used the eleven factors originally found in Policy Statement No. 1 in its application of § 126.103's totality of the circumstances test, but can make no argument that SBA *could not* use the eleven factors. Therefore, under *Seminole Rock*, the court must defer to the agency interpretation. First, Metro Machine points out that another regulation, 13 C.F.R. § 126.700, ensures that at least 50% of the labor cost of any contract awarded to a qualified HUBZone SBC must come from employees of qualified HUBZone SBCs.[12] Thus, § 126.700 places some restraint on how much labor can be subcontracted to workers who are not employed by qualified HUBZone SBCs. Metro Machine would not be able to use Metro On–Call employees to meet this 50% requirement, because Metro On–Call is not a qualified HUBZone SBC. Therefore, Metro Machine argues, it is inconsistent with the regulations to incorporate

the regulations, or in direct conflict with a statutory provision. Giving SBA's interpretation of 13 C.F.R. § 126.103 *less* deference because the agency chose to apply factors previously published for the purpose of giving substance to a totality of the circumstances test would make little sense.

12. Title 13 C.F.R. § 126.700(a)(1) provides that a "qualified HUBZone SBC prime contractor can subcontract part of a HUBZone contract provided ... the qualified HUBZone SBC spends at least 50 percent of the cost of the contract performance incurred on the concern's employees or on the employees of other qualified HUBZone SBCs."

the eleven factors of Policy Statement No. 1 into 13 C.F.R. § 126.103, because Policy Statement No. 1 was originally promulgated to place limits on subcontracted labor, and § 126.700 takes care of that concern.

Metro Machine is correct that the creation of Metro On–Call does not allow it to skirt the 50% requirement of § 126.700. However, shifting the employees did give Metro Machine an advantage in initially obtaining the HUBZone preference, which then permits Metro Machine to obtain government contracts with bids that are not the lowest submitted. Metro Machine's argument incorrectly assumes that the 50% of labor cost requirement is the only criteria relevant to whether a contract with an SBC is carrying out the purposes of the HUBZone program. Numerous other criteria are relevant as well in determining whether a bidding preference for a particular entity is likely to carry out the purposes of the HUBZone legislation, as set forth in 13 C.F.R. § 126.100. Notably, § 126.700 is phrased in terms of subcontracting that a "qualified HUBZone SBC" is permitted to do—not subcontracting a small business is permitted to do in order to become a qualified HUBZone SBC.

Metro Machine also argues that the factors set forth in Policy Statement No. 1 were originally intended to guide a totality of the circumstances test for § 121.106(a), which otherwise defines "employee" differently than § 126.103.[13] For example, Metro Machine points out that in the § 121.106 context, the definition requires that a part-time employee be counted as a whole employee, whereas in the § 126.103 definition of employee for purposes of the 35% requirement, part-time employees are counted as employees only in the aggregate, to the extent their total work is equivalent to that of a full-time employee. In other words, § 121.106(a) seeks to define who should be counted as an "employee" as broadly as possible, while § 126.103 defines who should be counted as an "employee" more narrowly. Therefore, Metro Machine argues, it is plainly erroneous to use the same eleven factors to give substance to the totality of the circumstances tests in both regulations.

The court disagrees. Of course § 121.106 defines who should be counted as an employee differently than § 126.103; the two regulations were written for different purposes, and they take into account different policy considerations. While 13 C.F.R. § 121.106 was promulgated under § 2(a) of the Small Business Act of 1958, 15 U.S.C. § 631, SBA promulgated 13 C.F.R. § 126.103 to implement and carry out the policies of the HUBZone Act of 1997. A broad definition of "employee" in 13 C.F.R. § 121.106(a) was necessary because Congress' declared intent in § 2(a) of the Small Business Act was to promote free enterprise and strengthen the economy by supporting the proliferation of small businesses. See 13 C.F.R. § 121.1 (1985) ("It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise."). In order to effectuate this policy, SBA had to ensure that its regulations would promote an increased number of small businesses, not an increased number of employees at existing, larger businesses. In other words, SBA had to ensure that government contracting preferences would not go to businesses that were not actually

---

**13.** Title 13 C.F.R. § 121.106(a) provides that "[e]mployees counted in determining size include all individuals employed on a full-time, part-time, temporary, or other basis. SBA will consider the totality of the circumstances, including factors relevant for tax purposes, in determining whether individuals are employees of the concern in question." 13 C.F.R. § 121.106(a) (2002).

"small," but instead used subcontractors, part-time employees, and other creative employment arrangements in order to appear "small" and receive preferred status. Therefore, as a safeguard, workers employed on a part-time, temporary, or any other basis are counted as employees under § 121.106(a).

The HUBZone legislation was enacted for entirely different purposes. Rather than seeking to increase competition and promote free enterprise for small businesses vis-à-vis large businesses, the HUBZone Act gives a substantial preference to particular small businesses over all other businesses, large and small. The overarching policy behind the HUBZone Act was to "increase employment opportunities, economic development, and investment in areas where unemployment has historically been above national averages." 13 C.F.R. § 126.100. In order to increase employment opportunities, Congress felt it was important that 35% of a small business's employees reside in a HUBZone. 15 U.S.C. § 632(p)(5)(A)(i)(I)(aa). To ensure that small businesses entitled to the HUBZone bid preference. were actually committed to creating real employment opportunities to individuals living in HUBZones, SBA defined "employee" more narrowly in § 126.103, choosing not to include temporary employees, leased workers, or independent contractors. The obvious reason for this limitation is to prevent a small business from hiring a number of HUBZone residents temporarily, solely for the purpose of qualifying as a HUBZone SBC, only to terminate their employment once SBA certified the company for the bidding preference. Further, § 126.103 states that part-time employees are only to be counted "where the work of such employees [in the aggregate] add[s] up to at least a 40 hour work week." 13 C.F.R. § 126.103. Again, the reason for this limitation is to prevent small businesses from artificially increasing their percentage of HUBZone resident employees by offering part-time positions to HUBZone residents, while the more highly-compensated full-time workers reside outside of a HUBZone.

Nevertheless, both regulations contain a "totality of the circumstances" component that on the face of both regulations serves the same purpose: to provide a general definition of the word "employee." Section 121.106(a) states that "SBA will consider the totality of the circumstances, including factors relevant for tax purposes, in determining whether individuals are employees of the concern in question." Section 126.103 states that "[t]he totality of the circumstances, including factors relevant for tax purposes, will determine whether persons are employees of a concern." [14] Nowhere else in either regulation is the word "employee" itself given independent meaning. Thus, in both § 121.106(a) and § 126.103, the "totality of the circumstances, including factors relevant for tax purposes" provides a basic, general definition of what makes a worker

---

14. The Internal Revenue Code defines "employee" in numerous sections. One of the most often-cited definitions of "employee," however, comes from 26 C.F.R. § 31.3401(c)–1(b), which defines employee for purposes of federal income tax withholding. Under this section,

> [g]enerally the relationship of employer and employee exists when the person for whom the services are performed has the right to control and direct the individual who per-

forms the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. . . . The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In

an "employee," which the rest of the respective regulation qualifies by including or excluding particular types of employment arrangements in order to implement the policies of the relevant statute.[15] It is unsurprising that SBA felt the same factors are relevant to both totality of the circumstances tests, because the rest of the definition of "employee" in § 121.106 and § 126.103 ensures that the policies of the Small Business Act and the HUBZone Act, respectively, will be implemented. Without a showing that the eleven factors used by SBA to decertify Metro Machine cannot possibly inform the agency's basic definition of "employee" consistent with the existing HUBZone regulations, it simply is not "plainly erroneous" for SBA to utilize the same eleven factors to give substance to both tests under both regulations.[16]

**2. SBA's determination that the employees transferred to Metro On–Call should be counted as employees of Metro Machine for qualified HUBZone SBC certification purposes did not ignore a clearly established rule.**

■ Metro Machine also argues that SBA's decision to decertify it is not enti-

tled to *Seminole Rock* deference because the decision was contrary to 13 C.F.R. § 126.204 and to the last sentence of the definition of employee in § 126.103. Section 126.204 states:

**May a qualified HUBZone SBC have affiliates?**

A concern may have affiliates provided that the aggregate size of the concern and all its affiliates is small as defined by part 121 of this title.

13 C.F.R. § 126.204. Metro Machine argues that the 2001 amendment of § 126.204, which recast the regulation into its present form, prohibits SBA from determining whether "employees" of an affiliate are, for HUBZone certification purposes, employees of the HUBZone SBC itself.

Prior to 2001, § 126.204 required that any affiliates of a qualified HUBZone SBC also qualify as HUBZone SBCs or under another SBA preference program. In response to complaints that the former affiliation requirement was "unnecessarily restrictive," SBA amended § 126.204 to its current form. 65 Fed.Reg. 58964 (Oct. 3, 2000). From this history, Metro Machine

general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.

26 C.F.R. § 3401(c)–1(b) (2003). Thus, consistent with 13 C.F.R. § 126.103, it is apparent that the eleven factors used by SBA in decertifying Metro Machine included many factors relevant for tax purposes.

**15.** As is clear from the fact that no general definition of the word "employee" is provided by either regulation, the totality of the circumstances test, along with the definition of employee for tax purposes, was intended in both regulations to provide a basis for understanding what generally makes a worker an

"employee." The particular exclusions of each regulation then custom-fit the regulation's definition of "employee" to the relevant statute. In other words, the statement in § 126.103 that "leased employees are not employees for these purposes," assumes an understanding of the word "employee" generally, outside the context of the HUBZone program.

**16.** It is significant that Metro Machine does not object specifically to any of the factors SBA used in its determination that employees of Metro On–Call counted as employees of Metro Machine for HUBZone purposes. Metro Machine only objects generally to the use of factors from Policy Statement No. 1 for purposes of interpreting 13 C.F.R. § 126.103.

draws the conclusion that "the whole point of the change in the affiliation restriction was to permit small businesses to set up affiliates whose employees would *not* be aggregated for purposes of meeting the HUBZone requirements." (Mem. in Supp. of Decl. J., at 7.)

Again, *Seminole Rock* deference is due to all interpretations of agency regulations that are not plainly erroneous and do not ignore a clearly established, unambiguous rule. *Deaton,* 332 F.3d at 709. Section § 126.204 is certainly not an unambiguous rule that SBA may not make a determination of who an "employee" of the relevant SBC is for purposes of qualified HUBZone SBC certification. Therefore, SBA's decision is entitled to *Seminole Rock* deference.

Moreover, Metro Machine's argument that the 2001 amendment of 13 C.F.R. § 126.204 would be "meaningless" if it does not permit a company to shuffle non-HUBZone resident employees over to a dormant subsidiary solely for the purpose of obtaining qualified HUBZone status does not withstand scrutiny. The flaw in this argument is that it assumes that in all cases where small businesses are "affiliated," the workers for all affiliates work together on the same contracts and are interchangeable. Metro Machine does not argue that Metro On–Call has any business separate from Metro Machine's business. It is likely that the purpose of the 2001 amendment was to loosen the affiliate rules so that companies who legitimately hired 35% of their workforce from a HUBZone would not be disqualified from achieving preferred status based on a mere affiliation or common ownership with a company involved in a different business not located in a HUBZone.

Finally, at the February 5, 2004 hearing, Metro Machine also argued that the last sentence of the definition of employee in § 126.103 itself bars any decision by SBA that employees of Metro On–Call should be counted as employees of Metro Machine for HUBZone purposes. The last sentence of 13 C.F.R. § 126.103 provides that "[t]emporary employees, independent contractors or leased employees are not employees for these purposes." This argument has no merit for the simple reason that Metro Machine does not contend that employees of Metro On–Call are temporary employees, leased employees, or independent contractors. To the contrary, it is largely *because* employees of Metro On–Call do not share the characteristics of temporary employees, leased employees, or independent contractors that the eleven factors used by SBA led the agency to the conclusion that employees of Metro On–Call should be counted as employees of Metro Machine.

## C. The Decision to Decertify Metro Machine is Not "Arbitrary and Capricious" Within the Meaning of 5 U.S.C. § 706(2)(A)

Thus, giving *Seminole Rock* deference to the agency's interpretation of its own regulations, SBA's decision to decertify Metro Machine cannot be seen as "arbitrary and capricious" under 5 U.S.C. § 706(2)(A). SBA established permissible factors for the determination of who an SBC's "employees" are for HUBZone purposes and there is no contention that SBA applied these factors in an unfair, partial, or erroneous manner. SBA did not rely on factors that Congress did not intend it to consider; Congress did not express any intent as to who should be considered an "employee" of a HUBZone SBC in the statute.[17] Moreover, SBA's decision did

17. Metro Machine argues that SBA's decision

was arbitrary and capricious because "Con-

not amount to a "clear error of judgment," and it does not conflict with the HUBZone statutes. *See Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. Therefore, the decision to decertify Metro Machine was not "arbitrary and capricious" under § 706(2)(A).

### IV. Conclusion

For the reasons set forth, defendants' motion for summary judgment is **GRANTED**. Plaintiff's motion for summary judgment is **DENIED**. The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Final Order to counsel for all parties.

**IT IS SO ORDERED.**

gress clearly *intended* small businesses to act in response to the HUBZone incentives by taking steps necessary to qualify as HUBZone contractors." (Metro Machine's Mem. in Supp. of Mot. for Summ. J., at 28.) While it is no doubt true that Congress wanted small businesses to act in response to the HUBZone legislation, Congress was obviously looking to inspire small businesses to hire more workers from HUBZones, move their principal offices into HUBZones, and to take other substantive measures that would have the effect of increasing employment opportunities, economic development, and investment in HUBZone areas. *See* 13 C.F.R. § 126.100. It is far-fetched to argue that Congress was hoping small businesses would take the initiative to think up creative ways to manipulate the corporate form in order to qualify for the HUBZone contracting preference.